NO. 01-14-00822

FILED IN
1st COURT OF APPEALS
HOUSTON, TX
February 2, 2015
CHRISTOPHER A. PRINE,
CLERK

In The Court Of Appeals Of Texas
For The
First Supreme Judicial District Of Texas

_____

NO.1404673

IN THE 177th JUDICIAL DISTRICT COURT

OF HARRIS COUNTY, TEXAS

The Honorable Ryan Kelley Goeb Patrick, presiding

_____

Weylin  Alford

Appellant

VS

THE STATE OF TEXAS

Appellee

_____

**APPELLANT'S ANDERS BRIEF**

_____

GLENN J.  YOUNGBLOOD
Appellant's Attorney
5555 West Loop South, Ste. 395
(713) 432-1013
(713) 432-1013 FAX
SBOT # 22217400
glenlaw@comcast.net

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

LIST OF AUTHORITIES ............................................................................ 3

STATEMENT OF CASE ............................................................................. 4

STATEMENT OF FACTS ........................................................................... 6

   STATE'S WITNESSES ............................................................................ 6

Victor Ramirez, Harris County Sheriff's Office Deputy ............................... 6

Cheryl Roberson ................................................................................ 8

Audra Shannon.................................................................................. 9

   DEFENSE WITNESSES .......................................................................... 13

SUMMARY ......................................................................................... 13

ISSUES PRESENTED ............................................................................ 14

   ISSUE NUMBER 1 ............................................................................. 14

Argument and Authority....................................................................... 14

   ISSUE NUMBER 2 ............................................................................. 22

Argument and Authority....................................................................... 22

   ISSUE NUMBER 3 ............................................................................. 22

Argument and Authority....................................................................... 23

CONCLUSION..................................................................................... 26

# LIST OF AUTHORITIES

**CASES**

*Anders v. California*, 386 US 738,744, 18 LEd.2d 493, 87 S Ct 1396 (1967.................................................13

*Barras v. State*, 902 S.W.2d 178,(Tex.App.--El Paso 1995, pet. ref'd) .......................................................15

*Calcarone v. State*, 675 S.W.2d 785 (Tex.App.--Houston [14th Dist.] 1984, no pet.)..................................16

*Cedillos v. State*, 250 S.W.3d 145 (Tex.App.-Eastland 2008).......................................................................25

*Currie v. State*, 516 SW 2d 684, 685 (Tex. Cr. App. 1974); .........................................................................13

*Deck v. Missouri,* 544 U.S. 622, (2005) .................................................................................................23, 24

*Faretta v. California*, 422 U.S. 806 (1975) ...................................................................................14, 15,16, 20

*Fernandez v. State*, 564 SW2d 771 (Tex. Crim. App. 1978).......................................................................... 6

*Ford v. State*, 870 S.W.2d 155,(Tex.App.--San Antonio 1993, pet. ref'd) ....................................................15

*Hardee v. Kuhlman*, 581 F.2d 330 (CA2 1978)..............................................................................................26

*High v. State*, 573 SW2d 807, 813 (Tex. Cr. App. 1978). .............................................................................13

*Hobbs v. State*, 778 S.W.2d 185, (Tex.App.--Beaumont 1985, no pet.).........................................................15

*Holbrook v. Flynn*, 475 U.S. 560 (1986) .......................................................................................................26

*Illinois v. Allen*, 397 U.S. 337 (1970)......................................................................................................20, 24

*Johnson v. State*, 760 S.W.2d 277 (Tex.Crim.App. 1988). ...........................................................................16

*Johnson v. Zerbst*, 304 U.S. 458 .................................................................................................................15

*Jordan v. State*, 571 S.W.2d 883 (Tex.Crim.App. 1978). .............................................................................15

*Logan v. State*, 690 S.W.2d 311, (Tex.App.--Dallas 1985, pet. ref'd) ...........................................................16

*Long v. State*, 823 S.W.2d 259 (Tex. Crim. App. 1991)..........................................................................23, 25

*Manley v. State*, 23 S.W.3d 172, 173 (Tex.App.--Waco 2000, pet. ref'd) .....................................................15

*Nixon v. State,* 572 SW2d 699 (Tex. Crim. App. 1978) .............................................................................. 6

*U.S. v. Burch, 48 F.3d 1233 (10th Cir. 1995*) ...............................................................................................26

*United States v. Long*, 597 F.3d 720 (5th Cir. 2010)....................................................................................20

**CONSTITUTIONAL PROVISIONS**

Tex. Const. art. 1 § 10 .............................................................................................................................21, 22

U.S. Const. amend. 6th...........................................................................................................................21, 22

U.S. Const Amnd 14th............................................................................................................................21, 22

**STATEMENT OF CASE**

The Appellant, Weylin Alford was indicted on January 9, 2014 by a Harris County Grand Jury on a charge of Burglary of a Habitation, a Second degree felony alleged to have occurred on October 12, 2013. Said indictment further alleged that the Appellant had been twice previously convicted of the felony of Possession of a Controlled Substance in Cause Number 3022258 in the 147th District Court of Travis County, Texas on April 7, 2003 and Possession of a Controlled Substance in Cause Number 1289552 in the 185th District Court of Harris County, Texas on January 4, 2014 for enhancement purposes. The latter prior conviction was found to be a State Jail Felony inappropriate for enhancement purposes and was not included in the evidence presented nor was the jury informed of that conviction.

At the pre-trial hearing on September 9, 2014 The Defendant advised the Court that he wanted to represent himself at trial. He was admonished by the Court that if that was his decision there would have to be another hearing to consider his request for self representation. The court further advised appellant that the Case was set for trial on October 3, 2014 and would not be continued to give appellant additional time, nor would it be continued at the request of any new lawyer appellant may hire. [Reporter's Record Vol. 2].

On September 19, 2014 the Court conducted a hearing in accordance with *Faretta* v. *California,* 422 U.S.806, 835 (1975) [Reporter's Record Vol. 3]. See also The Court's Order granting Appellant's request to represent himself at trial at [Clerk's Record , Pg.112].

Upon Appellant's plea of not guilty the case was tried before a jury on October 2, 2014. The jury found the Appellant guilty as charged.

On the morning before the commencement of the punishment phase of the trial, while in the hold over area outside the courtroom, the Appellant was found to have concealed, among other things a hand made stabbing instrument commonly referred to as a "shank". After a brief discussion the Court revoked Appellant's pro se status and appointed standby counsel to proceed.

After hearing the evidence and argument during the punishment phase of the trial the Jury sentenced Appellant to 30 years years confinement in the Institutional Division of the Texas Department of Criminal Justice.

Appellant gave timely and proper Notice of Appeal on October 6, 2014 and the Trial Court Certified Appellant's right to appeal.

**STATEMENT OF FACTS**

As must be done in accordance Fernandez v. State, 564 SW2d 771 (Tex. Crim. App. 1978) and Nixon v. State, 572 SW2d 699 (Tex. Crim. App. 1978), viewed in the light most favorable to the verdict, the record reflects the following:

*State's Witnesses*

**Victor Ramirez, Harris County Sheriff's Office Deputy**

Deputy Ramirez Testified that he responded to a call initially thought to be an Aggravated Assault at 942 Fruitvale, Houston, Tx. Upon arrival he met with the witness and home owner Cheryl Roberson and the Complainant Audra Shannon. Deputy Ramirez stated that he further learned that the case was a Burglary of a Habitation with intent to commit an assault. He also determined that the suspect had broken into the house and assaulted the Complainant. Entry into the house was gained by throwing a five gallon paint can through the front window. Deputy Ramirez took photos of the broken window, the paint can and the injuries sustained by the Complainant. the photos were admitted without objection as State's Exhibits 2, 3, 4, 5, 6, 7, 8, 9 and 10. [Reporter's Record, Vol. 5, Pg. 16 - 18]. Deputy Ramirez further testified that after he spoke to Ms Roberson and the Complainant he searched the general area to locate the suspect and found him at a Dollar

Store. The Appellant was taken into custody. [Reporter's Record, Vol. 5, Pg 20, 21].

Deputy Ramirez was shown State's Exhibit 11 which he identified as the medical report of the North East Medical Center. Having been on file 14 days prior to trial, the State offered State's Exhibit 11 and it was admitted without objection.   [Reporter's Record, Vol. 5, Pg. 22-23]. The State requested and was granted permission to orally publish State's Exhibit 11 to the jury:

MR. GILLIAM: State's Exhibit No. 11 are medical records from the Houston Northwest Medical Center. The notes indicate that the patient states that she was assaulted by a fist, that she had injuries to her head and face. The diagram on the records indicate a contusion to her face and possibly to her neck.

Included in these records are records from the Harris County Emergency Corps. The records state that the medic was dispatched to a possible assault and upon arrival to the scene the complainant was noted to be sitting upright outside sitting in a chair saying that she was beaten up by her boyfriend. The boyfriend came over to talk and she did not let him. He broke the window and assaulted the patient. She states that she was hit with his fist and denies him using anything

other than a fist. She states she is having neck pain and that her head hurts. [Reporter's Record, Vol. 5, Pg. 23-24].

**Cheryl Roberson**

Ms. Roberson testified that she knew Appellant from work at Wal-Mart where she was employed as a cook in the deli department and he was thought to be a stocker. She also met the Complainant, Appellant's girlfriend, who she knew as Shay. This witness made an in-court identification of the Appellant. Ms Roberson went on to testify that she had known the Complainant and Appellant a short time; approximately two weeks. [Reporter's Record, Vol. 5, Pg. 37, 38].

Ms Roberson further testified that the Complainant began to live with her for about 4 or 5 days at her residence at 914 Fruitvale, Houston, Harris County, Texas, when the alleged incident occurred. The Complainant began to live with Ms Roberson because she was told by Appellant that she had no place to go. The Complainant moved in bringing her belongings with her and was allowed to sleep on a couch. [Reporter's Record, Vol. 5, Pg 38 - 39].

The witness went on to state that on October 12, 2013 while the Complainant was living with her they came in contact with the Appellant. She described how Appellant first knocked on the door and asked for Shay. When Appellant was told Shay wouldn't come in there because she was

scared, he said "I'm going to count to ten." At that time Appellant did not have permission to enter the home. When I shut the door he got the paint can and hit it through the window and went in and beat her up. [Reporter's Record, Vol. 5, Pg. 40 - 43].

When the window was broken Ms Roberson, her three grandkids ages 5, 6 and 8 as well as the Complainant were in the living room. Ms Roberson told appellant to get out of her house. The appellant walked to the Complainant and beat her up; he kicked her, hit her in the face. The beating lasted for 15 minutes according to the witness. Ms Roberson kept telling him to "Get out of my house." [Reporter's Record, Vol. 5, Pg. 45 -47].

When Appellant left leaving blood all over her floor, Ms Roberson and her next-door neighbor went to find him and found him by the General Dollar Store. She knew where to look because the busses do not run late on weekends so she decided to look near the General Dollar Store where he was probably trying to get back on the bus. When they saw the Appellant she called the police. When they arrived she told the Deputy what had happened. [Reporter's Record, Vol. 5, Pg. 47 - 50].

## Audra Shannon

Ms Shannon testified that she is also known by her nickname Shay and that the Appellant was her ex-boyfriend who she identified in court. She

said that she and the Appellant dated for about six to nine months after meeting at a homeless shelter downtown called the Bread of Life. They were still dating on October 12, 2013. They were not living together on October 12, 2013 and she was living with Cheryl Roberson. The Complainant was uncertain of the length of time she was living with Ms Roberson and expressed the time as one to two weeks. [Reporter's Record, Vol. 5, Pg 60 - 63]

Complainant testified that she had a conversation with Appellant on the morning of October 12, 2013. She stated:

"I received a call from the Defendant. He was extremely upset because prior to that morning we had made an agreement since he was too busy and couldn't obtain his work badge -- his nametag before he left his job, his co-worker had given it to me to give to him. But before I could give it to him, he had already gotten on the bus and went to do other things.

So I took the name badge home with me, and we had agreed that the morning in question we were supposed to meet so that he could take his name badge and go to work."

She went on to explain that she did not agree to allow him to come over to get his badge:

"Because the conversation that we had the time he called me and we were in the conversation he was already upset and told me forget it, that he was just going to call off -- call in and call off of work and not to worry about it. The whole time that we were on the phone in conversation he was telling me that he was on his way to work, which really his initial intentions and his ending goal was he was on his way to the residence where I was living at."

She explained that the initial lengthy conversation ended when he said he had to call someone and he would call back. The second conversation was short and ended right before he arrived at the house. During the second conversation he was calling her a "B" and a "H" and accused her of turning against him; that she was letting people get into her head and he wanted her to gather her belongings and leave with him immediately. She learned Appellant was at the residence when he unexpectedly knocked on the door . [Reporter's Record, Vol. 5, Pg 64 - 67].

Complainant explained that she, Ms Roberson and Ms Roberson's three grandchildren were in the room when Appellant knocked on the door and wanted her to come out. She refused to go out to meet Appellant because she didn't trust him. She said that she had seen him mad before; that he had serious anger and aggression issues so she was not going to put

herself in a position for him to do bodily harm to her. Appellant was given his name badge and was asked to leave the residence. [Reporter's Record, Vol. 5, Pg. 68 - 69].

Complainant continued stating that she heard Appellant say "you got to the count of three or I'm coming in." All of a sudden they heard a crash and Appellant came charging around the corner with a look she had never seen before. There was no emotion, no expression. She described it as "… what you would consider a stone cold killer if you watch movies." Appellant came at her quickly giving her no time to react and started pounding on her with his fists knocking her to the floor continuing to hit her head and face seven or eight times before kicking her in her back her butt check and head. . [Reporter's Record, Vol. 5, Pg 69 - 71].

While she was being beaten Ms Roberson and her grandchildren were in the room. The oldest grandchild was curled up in a fetal position under the coffee table right next to where Complainant was laying while being beaten. Complainant also estimated she was beaten over a 15 to 20 minute period. Appellant stopped beating her, got up, took one step and turned around and took her wallet and cell phone and left. [Reporter's Record, Vol. 5, Pg 71 - 72].

Complainant identified herself in State's Exhibit 5 showing bruises and contusions resulting from the beating she received at the hands of the Appellant, Weylin Alford. [Reporter's Record, Vol. 5, Pg. 76].

## *Defense Witnesses*

The *pro se* Appellant produced no evidence in his defense. No witnesses were called by the Defense, nor did the Appellant take the witness stand to testify in his own defense. He simply rested and closed.[Reporter's Record, Vol. 5., Pg 85-85].

## Summary

This Brief is prepared pursuant to the requirements for frivolous appeals as set forth in *Anders v. California,* 386 US 738,744, 18 LEd.2d 493, 87 S Ct. 1396 (1967); *Currie v. State,* 516 SW 2d 684, 685 (Tex. Cr. App. 1974); and *High v. State*, 573 SW2d 807, 813 (Tex. Cr. App. 1978).

Appellate counsel sets forth three issue dealing with the Court's revocation of the appellant's right to self representation under Federal and State law; ordering the Appellant shackled during the punishment phase of the trial.

**Issues Presented**

*Issue Number 1*

APPELLANT WAS DEPRIEVED OF HIS CONSTIUTIONAL RIGHT TO REPRESENT HIMSELF DURING THE PUNISHMENT PHASE OF THE TRIAL IN VIOLATION OF THE U.S. Const. amend. 6TH AND 14TH.

**Argument and Authority**

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment. This clear constitutional rule has emerged from a series of cases decided here over the last 50 years. The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so." *Faretta v. California*, 422 U.S. 806 (1975). "Although the right to self-representation is absolute, a waiver of the right to counsel will not be

lightly inferred, and the courts will indulge every reasonable presumption against the validity of such a waiver." *Manley v. State*, 23 S.W.3d 172, 173 (Tex.App.--Waco 2000, pet. ref'd)(internal quotations omitted); see *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019 1023, 82 L.Ed. 1461 (1938), and *Jordan v. State*, 571 S.W.2d 883, 884 (Tex.Crim.App. 1978).

"The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' Illinois v. Allen, 397 U.S. 337, 350 -351 (BRENNAN, J., concurring)", *Faretta v. California* 422 U.S. 806.

If the record indicates a clear expression of the defendant's desire to proceed *pro se*, accompanied by careful and thorough admonishments from the trial court, the reviewing court should conclude that sufficient evidence exists to support allowing for waiver of counsel. See *Barras v. State*, 902 S.W.2d 178, 180-81 (Tex.App.--El Paso 1995, pet. ref'd); *Ford v. State*, 870 S.W.2d 155, 158 (Tex.App.--San Antonio 1993, pet. ref'd); *Hobbs v. State*, 778 S.W.2d 185, 186-87 (Tex.App.--Beaumont 1985, no pet.); *Logan v. State*, 690 S.W.2d 311, 313-14 (Tex.App.--Dallas 1985, pet. ref'd). Although

there has been no exact line of questioning set out to establish a knowing and intelligent waiver of the right to counsel, the trial court should at least inquire into the accused's age, background, education and experiences, in addition to making the accused aware of the advantages and disadvantages of self-representation. *Calcarone v. State*, 675 S.W.2d 785, 786 (Tex.App.-- Houston [14th Dist.] 1984, no pet.). Moreover, the court should make the accused aware of the general nature of the offense charged, aware that the accused must comply with the rules of evidence and criminal procedure, and aware that the accused will receive no special consideration by the court. Id. All of these admonishments should be sufficiently reflected within the record to enable the appellate court to make an accurate assessment of the decision of the accused. *Johnson v. State*, 760 S.W.2d 277, 279 (Tex.Crim.App. 1988). See also *Faretta v. California*, 422 U.S. 806 (1975).

The trial court conducted a Faretta Hearing and complied with all of the above making the record in this case indicate a clear expression of the Appellant's desire to proceed *pro se.* Accordingly, the trial court granted Appellant his right to proceed *pro se*. [Reporter's Record, Vol. 3, Pg 5-33; Clerk's Record 112].

While the jury was deliberating the Appellant's guilt or innocence on the morning of October 2, 2014, the court addressed the Appellant out of their presence:

THE COURT:
Have a seat, Mr. Alford.

All right. Mr. Alford, it's my understanding that when you were brought up this morning Deputy Ojeda, who is one of my regular court bailiffs, found on you what appears to be some pills, a piece of wire, about a, I would say, 5 to 6-inch homemade jail shank, in addition to some other torn clothing that was used to secure it to your leg and other things like that.

In addition, speaking with Deputy Ojeda, he told me that your statement to him is that you've had it on you all of your court settings, which was -- I don't know if that's true because I know, according to Deputy Ojeda, he personally searches you when he -- when you've been on our docket, but you also stated that you had it on you yesterday.

Based on that statement, sir, you have now forfeited your right to represent yourself. You are now in the courtroom as a regular defendant.

You now have your leg shackles on you.

Mr. Alford, I'll get to you in a moment.

You now have leg shackles on you. The leg shackles, you need to be careful that the jury does not hear them while you move around; but Mr. Aguirre is now your attorney.

If you would like to take this issue up on appeal, you're welcome to do so. But at this time you are considered a very high risk and a very high threat to the safety of the people in this courtroom. I am not going to tolerate any outbursts from you, any movements that are not necessary or anything else.

Do I make myself explicitly clear, Mr. Alford?

THE DEFENDANT: Yes, sir.

THE COURT:

In addition, the ERT deputies will be in here. Whatever they feel is appropriate for the level of security now that they feel is necessary to protect everyone in this courtroom, including Mr. Aguirre, who was sitting next to you yesterday.

So have a seat, sir. We have some read back. Mr. Aguirre has gone over that with you.

THE DEFENDANT: May I --

THE COURT:

No, you may not. You are now represented by Mr. Aguirre. If you have any questions, you may address them through him. Have a seat.

Let's bring in the jury, please.

[Reporter's Record, Vol. 6, Pg 6 - 8].

Subsequently, a portion to the testimony of Ms. Roberson was read to the jury in response to their question, The jury retired and returned with a verdict of guilty. The trial continued to the punishment phase. Appellant made no further request or assertion of his right to self representation neither personally or through his attorney.

Courts had been told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings

by federal law and by most of the States, including The State of Texas, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See *Illinois v. Allen*, 397 U.S. 337 *Faretta v. California* 422 U.S. 806 (1975)  Of course, a State may - even over objection by the accused - appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *Faretta v. California* 422 U.S. 806 (1975).

In *United States v. Long*, 597 F.3d 720 (5th Cir. 2010 *No negative treatment in subsequent cases*) in discussing the waiver of the right of self representation said,  " [A] defendant can waive his Faretta rights, either by expressly requesting standby counsel's participation on a matter or by acquiescing in certain types of participation by counsel, even if the defendant insists that he is not waiving his Faretta rights .... [O]nce a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced ....

[S]tandby counsel's participation [must] be ' over the defendant's objection' in order to erode the defendant's Faretta rights."

In the case at bar the court terminated the Appellant's right of self representation based on the discovery of a "shank" on the person of the Appellant. This discovery was made while the Appellant was in the custody of the Harris County Sheriff's Office in the holdover cell and not in the courtroom. The weapon was taken from the Appellant and represented no threat to anyone in the courtroom. During the entire trial proceedings appellant was respectful to the court and his conduct was normal, reserved and appropriate to the circumstances in the courtroom. His conduct was not obstructionist in any manner. His conduct in the courtroom did not rise to the level of deliberately engaging in serious and obstructionist misconduct authorizing termination of Appellant's constitutional right to self representation under the U.S. Const. amend. 6th and 14th, and Tex. Const. art. 1 § 10.

However, Appellant placed himself inside the courtroom with the shank based on his alleged statement to Deputy Ojeda that he, Appellant, "…had it on him yesterday…" thereby raising his conduct to the level of deliberately engaging in serious and obstructionist misconduct authorizing termination of Appellant's constitutional right to self representation.

Appellant's right of self representation under the U.S. Const. amend. 6th and 14th, and Tex. Const. art. 1 § 10 were waived.

## *Issue Number 2*

APPELLANT WAS DEPRIEVED OF HIS CONSITIUTIONAL RIGHT TO REPRESENT HIMSELF DURING THE PUNISHMENT PHASE OF THE TRIAL IN VIOLATION OF THE Tex. Const. art. 1 § 10.

### Argument and Authority

The foregoing argument and authority presented above in the Argument and Authority for Issue Number 1 is incorporated herein with particular attention to the Texas case law cited.

## *Issue Number 3*

APPELLANT'S CONSTITUTIONAL RIGHTS UNDER THE U.S. CONST. AMEND. 5TH AND 14TH WERE VIOLATED WHEN THE TRIAL COURT ORDERED HIM TO BE SHACKLED IN FRONT OF THE JURY DURING THE PUNISHMENT PHASE.

**Argument and Authority**

The United States Supreme Court has held that the appearance of a defendant in shackles before a jury during a trial can violate the defendant's Fifth and Fourteenth Amendment rights to due process. *Deck v. Missouri*, 544 U.S. 622, 629–34 (2005). The Court reasoned that "visible shackling undermines the presumption of innocence and related fairness of the factfinding process[, ] . . . can interfere with the accused's ability to communicate with his lawyer" and "participate in his own defense, " and "affronts the dignity and decorum of judicial proceedings that the judge is seeking to uphold." Id. at 630–31.

'[A]ll efforts should be maintained to prevent the jury from seeing the defendant in shackles, except where there has been a showing of exceptional circumstances or a manifest need for such restraint.' *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). It is within the discretion of the trial judge as to whether a defendant shall be tried in handcuffs or shackles, and the trial court's decision is reviewed for abuse of that discretion. Id. (noting that "the record must clearly and affirmatively reflect the trial judge's reasons therefor").

Courts have recognized a narrow exception to this rule if a trial court determines that there is a particular need for shackling the defendant, such as

a demonstrated propensity to attempt escape or assault others in the courtroom. Id. (citing Deck, 544 U.S. 622, 627, 632 (2005), *Long v State*, 823 S.W.2d 259, 282. The trial court's determination is reviewed under an abuse of discretion standard. Long, 823 S.W.2d at 282.

A trial judge confronted by a defendant's disruptive conduct can exercise discretion to meet the circumstances of the case, and though no single formula is best for all situations, there are at least three constitutionally permissible approaches for the court's handling of an obstreperous defendant: (1) bind and gag him as a last resort, thereby keeping him present; (2) cite him for criminal or civil contempt; or (3) remove him from the courtroom, while the trial continues, until he promises to conduct himself properly. *Illinois v. Allen*, 397 U.S. 337 (1970).

The Fifth and Fourteenth Amendments of the United States Constitution prohibit the use of physical restraints visible to the jury unless the trial court in its discretion finds that they are justified by an essential State's interest such as physical security, escape prevention, or courtroom decorum. *Deck v. Missouri,* 544 U.S. 622, 628, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) . Courts have held that some circumstances justify the use of restraints during trial, including situations where an accused expressed his intention to escape, made threats of physical violence, resisted being brought

to court, repeatedly interrupted the court proceedings, attempted to leave the courtroom, or engaged in other egregious conduct. *Cedillos v. State*, 250 S.W.3d 145 (Tex.App.-Eastland 2008) .

When an appellant complains of the use of shackles, it is first determined if the trial court abused its discretion by allowing appellant to be shackled. If so,it must then be determine whether appellant suffered harm as a result. *Long v. State,* 823 S.W.2d 259, 282 (Tex.Crim.App.1991) .

In the case at bar, Court choose to employ the first of the Illinois v Allen options; to bind and gag him as a last resort, thereby keeping him present in the court room. The court choose not to gag Appellant. The court also utilized the services of the ERT deputies as a security precaution. [Reporter's Record, Vol. 6, Pg 6 - 8].

The chief feature that distinguishes the use of identifiable security officers from courtroom practices that might be found inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating

from outside the courtroom, or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. See *Hardee v. Kuhlman*, 581 F.2d 330, 332 (CA2 1978). *U.S. v. Burch*, 48 F.3d 1233 (10th Cir. 1995 No negative treatment in subsequent cases). See also H*olbrook v. Flynn*, 475 U.S. 560, 106 (1986), *Deck v Missouri*, 544 U.S. 622, 658-659 .

By his own statement to Deputy Ojeda Appellent admitted that he had had the shank on him in court the previous day. The court was then authorized to employ the extra ordinary use of shackles and the ERT deputies for increased security and protection of all those in the court room. There was no violation of Appellant's constitutional rights.


**CONCLUSION**
Based of the undersigned attorney's review of the record in this case, including the many misguided rambling motions filed by the appellant, legal

research conducted by said attorney and the arguments presented hereinabove, the appeal filed in this cause is wholly lacking in meritorious issues and is frivolous.

Respectfully submitted

_____
Glenn J. Youngblood
Attorney at Law
5555 West Loop South, Ste. 395
Bellaire, Texas 77401
(713) 432-1013 [Voice/FAX]
SBOT 22217400
glenlaw@att.net